Madam Clerk, please call the next case. Clause 15, Chapter 1 of the Act, RG Construction Services, Inc. v. Workers' Compensation Comm'n Good afternoon, Honorable Justices of the Appellate Court, Mr. Blum. My name is Robert Blum, and I'm President for the Appellate RG Construction Services. This is an appeal from the Workers' Compensation decision in which the issues are questions of fact and medical opinion. The reason why the Court should reverse the Commission ruling is based on video evidence as well as Dr. Etluri's testimony. Video evidence of surveillance of the acclaimed corroborates Dr. Etluri. And together, those combined elements of evidence should constitute the manifest way of the evidence and refute Dr. Silver's opinions on which the Commission relied. There's indisputable video evidence that the claimant was holding a cell phone to his right ear with his right hand while simultaneously rubbing the top of his head and scratching the back of his head on October 5, 2013, around 126 and 127 p.m. The arbitrator actually did find as a fact that the claimant performed the actions. These are shown in Respondent's Exhibit 6. Now, is this a single instance of the claimant lifting his left arm above his shoulder level? Is it only one of these instances? Well, there's only one where he lifts that high. There's another surveillance where he's doing some errands. He reaches out his left hand to open a car door or is carrying a tray of beverages with his right. And then another point, this is again September 25th of 2013, when his female companion gives him a shoulder bump on the claimant's right shoulder, her left shoulder. And he reacts with a smile. He doesn't react with pain. That tends to refute Silver's August 28th, 2013, reporting which he says that the claimant's in severe pain with his shoulders. Sure didn't look like it that day, September 25th, when he's caught on video. I mean, the commission reviewed the video. So, I mean, again, that's all in the mix of the manifest. Wait, they saw this? Yes. Okay. So? So, yes, it is part of the manifest way of argument, yes. Because the surveillance video supported what Dr. Ed Lurie said. Dr. Ed Lurie said that this gentleman had a long-term problem with his shoulders. He based the fact it was long-term on the x-rays that both Christ Hospital and he took shortly after the occurrence. Christ Hospital took these x-rays on August 22nd, 2012, which is 12 days after the occurrence. Ed Lurie took his on September 11th, which is 32 days after the occurrence. And they show that he had substantial degenerative changes. Mr. Newman? Yes, let me just interrupt you there at this point. You were talking about the surveillance video. And I don't know if you looked there. Two disks that are part of the record. Two disks? Part of the surveillance footage that you just indicated here isn't viewable by us because one of the disks, and I think it contains the footage from September 24th and 25th, has a hole cut in it where someone two-hole punched it to put it in the record. I don't know if in your review of the record you saw that that was the state of that disk, but we can't even look at it. Well, I did see that someone destroyed the disk, but I can give you another one, another copy. Is that permissible, Your Honor, since it's in the record? Counsel, I would object to that. I have no objection to that. Whoa, whoa, whoa, whoa, whoa. What do you think this is, a trial court? When he's finished, you'll get a chance. Okay. So, Mr. Newman, let me just suggest this to you. You're the appellant's attorney here. It's incumbent on you to ensure that the record is complete. Part of that responsibility includes making sure that any evidence of this type is capable of being examined by the court. I'm just telling you here, you may need to tailor your argument here in court, taking into account that we have not been able to look at the video footage for September the 24th or 25th. Your Honor, then I would make an oral motion to provide you with another copy of the same. Well, I think you better do it in writing. Right. It's a written motion request. Can I ask you a question? At time for counsel to respond. Can I ask you a question? What was Silver's diagnosis? Well, Silver opined that Mr. James has torn rotator cuffs bilaterally. Okay. And what was L. Terry's diagnosis? Well, he also agrees that the gentleman has torn rotator cuffs bilaterally. The difference is that Dr. Lurie, when he reviewed the MRIs of November 15th, 2012, he felt that on the basis of the degree of retraction that these rotator cuff tears were greater than 90 days old, 90 days being the interval between. So I'm a little bit at a loss. Both of the doctors say that the claimant has rotator cuff tears, right? Yes. So what difference does it make if he's putting his head above his head? Is your argument is that L. Terry's wrong, he has no rotator cuff tears? Oh, no, not at all. The point is that Dr. Lurie and Dr. Silver both indicated that with these rotator cuff tears that become long-term, that the individual who has them can develop musculature around the rotator cuff that substitute the motion and can still do quite well. Dr. Silver's quote was that, you know, with time and with. . . I don't think you're digesting my question. Let me see if I can. . . bilateral. And of what relevance is the fact that he was moving his hands to his head? The relevance is that Dr. Lurie is saying that these rotator cuffs did not stem from August 12th, excuse me, August 10th, 2012. They were preexisting conditions. There was a temporary aggravation caused by the incident where the individual fell, but the temporary aggravation had ended by March 12th of 2013. The individual is back in his status quo as he was before the occurrence, and he was capable of returning to the occupational duties in which he had been engaged at the time of the occurrence. That's the difference. Both doctors agree that an individual with chronic rotator cuff tears can develop collateral musculature and be able to do quite well and recover the functional abilities. It's just that Dr. Lurie says that based on his review of the X-rays taken shortly after the time of the occurrence and the MRI, that this individual's rotator cuff tears were preexisting, and he is well in the process of recovering. It takes a long time according to both of them, but Dr. Lurie places the time of the torn rotator cuffs as before August 10th of 2012, and that the individual has recovered to the extent that he can go back to work on March 12th of 2013. Now, the claimant testified he had never had any problems. I've never injured his shoulders. Either one of them never had any treatment. Is that correct? Didn't he testify to that? He testified to that. So, Dr. Silver, you're relying on partially, opioid claimant sustained massive, massive rotator cuff tears in both shoulders. So, did you have, was there any other medical records to impeach or contradict the claimant who said he never had any treatment for his shoulders prior to the day of the accident? Okay. I did, we did uncover any medical records that were dated before the date of accident showing that the claimant actually had treatment. Massive rotator cuff injuries are pretty significant, aren't they? Well, according to both Dr. Silver and Dr. Lurie, and I'm relying on that Lurie really, not Silver, I said a quote from Dr. Silver who was an admission against the interest of the party that he's testifying for, but, excuse me, what Dr. Lurie was explaining is that with chronic rotator cuff tears, they can be quite large and yet the person can have quite good function. And never seek any medical treatment? Well, apparently if you have it long enough and develop it gradually enough, that's possible, yes. Dr. Lurie said the condition in his shoulders rendered the claimant unable to perform the full range of carpentry, right? He did say that, but then he said the individual could go back to the work as he had done for this company. Is there any evidence that the claimant was limited in his carpentry duties prior to the August 2012 accident? There's no evidence of a specific medical restriction. However, the company he was working for, RG Construction, does office build-outs. Dr. Lurie's testimony was he can go back to doing what he was doing for them. Now, is there any evidence in the record that the claimant was somehow restricted in any way, quite limited in fulfilling his job as a carpenter? Was he able to do the full range of carpentry duties? The evidence is that he was doing the work of a construction carpenter as done at RG Construction Services, which is office build-outs. And that's what Dr. Lurie said he could go back and do. He's asking that question, obviously, because that would tend to support and corroborate your argument. If he's not able to do the work there, he's off work, he's missing work, he's on restrictions, that would indicate that this is a preexisting condition. If the guy is working for years at a company with no restrictions and no problems and suddenly says, I injured my shoulders, that would corroborate his version, wouldn't it? It had to be related to the accident. So you have no knowledge or any records in evidence that would suggest that he had any preexisting problems, as you're opining, prior to the accident date, correct? The evidence that he had preexisting problems is on the x-rays and the MRIs. But nothing in the work record? As interpreted by Dr. Lurie. That's where that evidence is. But nothing in the work record, correct? I don't have a record of a specific day before August 10, 2004, where he missed a day for his shoulders. I don't have that evidence. What we have is Dr. Lurie looking at the x-rays taken 12 days after the occurrence and saying, well, that degree of glenohumeral arthritis can't have occurred in 12 days. That degree of migration of the humerus up superiorly out of the glenoid socket, that can't have developed in 12 days. So that's the evidence that we have. Do you have medical opinions based upon the surveillance videos? No, we didn't submit the surveillance videos to the doctors. It was tried on the 19B. Well, I suppose my question is a simple one. If you contend that the surveillance video supports some opinion of Dr. Lurie, don't you think it would have been wise on your part to at least submit the surveillance video to Dr. Lurie to find out what his opinions were after he saw them? Yes, it would have been really a smart idea on my part, and it's an excellent suggestion on your part, if we would have sent the videos to Lurie and said, doesn't this prove you're right? But you're trying to suggest to us that it does prove him right. Well, I think it does, yes. But you have Silver and Lurie both having the opinion, this guy's got bilateral rotator cuff tears. But it's you that's saying that he couldn't do this if the rotator cuff tears were only the result of his work accident. No, it's not me that's saying he couldn't do that. It's Petitioner, it's the claimant who's saying he couldn't do that, and it's Silver who's saying he couldn't do that, and it's the video that's showing that in fact he can and that they're both wrong. You're talking about he lifted his arms and put them on his head. And that's what he said he couldn't do, and that's what Silver said he couldn't do, and that's what Silver's whole opinion says to what the Petitioner means as far as work restrictions and additional physical therapy is based on his impression that the Petitioner can't move his arms. Mr. Newman, I did review the surveillance video that shows the claimant putting the phone up to his ear, and it was simply a matter of having the elbow down close to the side of his body and putting his forearm up with the phone next to his ear. So it doesn't demonstrate him lifting his arm and rotating his shoulder. Are you suggesting there's something else in there that demonstrates this additional motion of the shoulder? Well, he certainly does with his other arm because he puts his other arm up, his left arm up to the top of his head. And at some points when he's got the cell phone, you know, he's kind of bending over talking to it. Sometimes he's more straighter, more in a straighter position. So I want to try. I can't get my arms around this. Silver says he can't do this. Ed Lurie says he can't do this. And you have a surveillance video that says he can't, but yet you want to rely on Ed Lurie's opinion. Silver's, excuse me. Let me answer you. Dr. Lurie said on the March 12th of 2013 examination that the range of motion at that point was much better than it had been on December 20th of 12 and September 11th of 12, and that he felt based on that that the claimant was improved and that the claimant could go back to work. And so he's testifying the claimant's improved before the videos were taken. That's true, yes. Okay. Yes, he can get better before the videos are taken. So what I'm trying to understand is what does the video have to do with the causation opinion? Nothing. It shows that Silver and the petitioner were not telling the truth. Maybe Silver was fooled by the petitioner. So it doesn't support Ed Lurie's opinion. The only thing it does is address the credibility of Silver and the claimant. That's the main thing it does is it shows that Silver based his opinions on the claimant saying he could raise his arms. The claimant testified before the arbitrator, page 33 and 36, that he could. And the video shows it. Let me see if I can get these dates straight here, Ed Lurie's opinions. Ed Lurie is it? He examined the petitioner on March the 12th, 2013. Right. Wrote a report dated April the 3rd, 2013. That's right. Determined the claimant's condition significantly improved and he appeared to have reached his pre-injury state. That's right. Okay. So the video isn't taken until September and October of 2013. So according to Oteri, the guy had already improved. I mean, he can do what he's doing in the video, right? That's Oteri's opinion? Yeah. I don't think Ed Lurie would have been surprised to see that at all. Okay. Well, let me ask you. In January of 2013, he issues a report and says, there are no objective findings that indicate any type of permanent aggravation to his chronic shoulder conditions. He doesn't consider the claimant to be a good historian. I don't understand. Oteri keeps saying that in his opinion, the claimant was not able to work in the full range of carpentry, which is classified as heavy in nature. That's true? That's what he testified to when he was cross-examined? Yeah. Was he working in full range of carpentry services that's heavy in nature prior to his work accident? The claimant testified that the heaviest lifting he had to do before the occurrence was about 30 pounds. So I guess not. So you don't think he was? He wasn't working in the full range of carpentry duties because he was working only on office build-ups, for this company at least. And he testified that his heaviest lifting he had to do was about 30 pounds, yes. So that doesn't really corroborate the idea that he was working in heavy work. 30 pounds would typically be medium work. Your time is up. Thank you. Good afternoon, Justices. Alan Blum on behalf of the GAP belief. My opponent is valiantly trying to retry the case. This is a manifest weight. This is within the province of the commission who exercised its administrative functions in resolving all medical witness issues, causation issues, questions of fact of witnesses. And if there is sufficient evidence to support their decision, not this court, if they think there's a difference of opinion, as long as there's sufficient evidence and they looked at everything and they resolved all the conflicts that's in the record, their decision should be affirmed by this court. And I'm going to, first of all, the accident is not in dispute. Medical causation, TTD, prospective medical care, and some medical bills. There's only, it's a straightforward perspective from opposition. The arbitrator found medical causation, TTD, prospective medical care, and some medical bills. The commission unanimously, all three commissioners, adopted the arbitrator's decision. Circuit court affirmed. There's only two medical doctors. And I agree, and the treating doctor, Dr. Silver. Dr. Silver opined within a reasonable degree of medical surgical certainty that the tendon tears bilaterally, not degenerative arthritis that my opponent's talking about. We're not talking about degenerative arthritis. We're talking about retracted, fully retracted tendon tears were directly related to the August 10, 2012 accident. And he based his opinion on several things. One, the history of the employee, where he never had an injury before. He had no restrictions. He had no treatment. He had no symptoms. He also said the mechanism of injury, which is corroborated by the Christ Hospital emergency room, the night of the accident, indicated that this bilateral pain was from a sudden onset falling to the ceiling tiles after tripping under debris at the construction site. For all those reasons, that was the basis. And the IME, I didn't make an inference. The employer did not like the first report. They said there's medical causation from Dr. Acklery, so they made him go back and do three more reports and started speculating about this guy must have had problems before, but he worked there 20-some years and never had any problems. The commission resolved their conflict justices. They said the treating doctor's testimony and all the other evidence gave the treating doctor credibility and Acklery's opinions were not persuasive. In fact, Dr. Acklery's first report, Justice Hoffman said, he said in the first report, based on the history of this claimant, I find causation. And you know what? He may never be able to go back to do full range of carpentry work. He's going to have some weakness in his shoulders, and he may not have limitations. He may not have full limitations. I can tell you, ironically, in his evidence deposition, Dr. Acklery, he says, well, this guy only had a temporary aggravation, but it's an aggravation, which is still consistent with the CISCOR decision, but the treating doctor said that fully retracted tears are directly related to this accident. But Dr. Acklery said, in the future, this guy's a candidate for reconstructive shoulder surgery, so he's got some really serious problems, and he worked all the way up to the day of the accident, never missed anything, and the commission decided they gave him credibility to the treater. Going to TTD, the commission awarded 68 weeks of TTD, and my opponent cited three cases, Chewarko, Hayden, Archer-Daniels, for justification to suspend TTD, which he's claiming the commission's decision is inconsistent, but the commission in this present case is consistent with all those cases for the following reasons. If somebody retires voluntarily after the accident, TTD stops. It's not present here. There's no retirement. Number two, the treating doctor's records from the day he first saw the employee until the last day of the quarter period, he never released him for any light-duty work, none. He's also claimed that he was far from reaching maximum medical improvement. The job offer for light duty by the employer is irrelevant because the treating doctor never released him to do any light-duty work. And, of course, there was no, and the commission also decided that, they cited the treating doctor, that he did not reach maximum medical improvement, and that the other exception, that if there's reaching a state of permanency, the TTD should be suspended. About the video now, and I will concede that if you didn't see, you saw the justice with the cell phone on one hand, there is only one segment, less than 60 seconds, I put it in the brief, where the left hand, he starts to scratch his head slightly. I argued that, the arbitrator saw it, the commission unanimously affirmed the arbitrator's decision. They didn't buy that. As a result of that question, is that equivalent to being able to work? And they seem literally, I'm sure you would agree, hundreds if not thousands of videos. There isn't any video of casting, flying fishing, jumping rope, jacking up a car, riding a motorcycle, carrying furniture. We're talking about somebody standing still, holding a phone, and scratching their head, which I argued that that's less strenuous than shampooing somebody's head. And if we're going to equate that and say, oh, oh, he can work and he's lying, I don't know where we're going, but I think the commission within the province has the ability to decide that question and say, we don't think it's meritorious to suspend benefits. And they did, right? And they didn't. Prospective medical care, believe it or not, Dr. Adler agreed with Dr. Silver, the two of them on one issue. These tears are irreparable surgically. You can't fix them. Dr. Silver, he hasn't made some medical improvement. I want this man to get professional, supervised, additional physical therapy, because I'm not releasing until we can see and determine what kind of work can he do after he gets to work. But it was denied by the employer. And they're suggesting, oh, he can go do his own self-administered therapy. Well, I guess all the therapy institutions are worthless and we should just abolish them. Well, I'm sorry. This man has fully retracted tears. He probably does need to reconstruct the surgery down the road. But for now, you can't fix them surgically. Let's get them better. So the commission has sufficient evidence. They went down the line, gave credibility to the treater. They were not dissuaded by the IME. And we're hoping he will affirm their decision, because they've done everything consistent with all of the public decisions. Thank you. Thank you, counsel. Counsel, you may reply. Well, Dr. Emory said his first examination that it was a temporary aggravation of a preexisting condition that he saw was present. Second and third examinations, second examination December 20th, 12th, third examination March 13th. And March 12th and 13th that the individual did get better, especially as to the third examination. He thought the aggravation of the preexisting condition was ended as of March 12th and 13th. Respondent did offer work. The claimant did not call Dr. Silver if he thought he couldn't do what was being asked and find out what he could do. He did go to see Dr. Silver on March 17th. Excuse me, that was April 17th of 13. But there's no evidence that they had any discussion of the offer of work or what the claimant could do. I feel that's in the spirit of the Siwarko case. That's noncompliance with an offer of reasonable work. As far as therapy is concerned, the individual did have four months of therapy that was sponsored by the respondent. He wasn't really all that cooperative with it. As the January 8th of 2013 report of the physical therapist shows, he wouldn't even let them detect his ranges of motion. So he really wasn't cooperating with that. Dr. O'Leary said that the individual in four months' time would be able to learn the physical therapy and he could do it at home if he would. This individual I think was, you know, obviously he was trying to fool Adler. He was trying to fool us. That's why he lied to the arbitrator. He demonstrated his ability to move his arm before the arbitrator. He only moved his arms like two inches above his knees. And obviously on the video, he could do much more than that. And Silver was fooled. You can see that in the August 28th report. And the video showed that he really did have the ability to move his arms. Silver was just fooled. He was wrong. His opinion should be discounted for that reason. Thank you. Thank you, counsel, both for your arguments in this matter. We'll be taking an advisement. Written disposition shall be issued.